**LUTHERAN BROTHERHOOD
RESEARCH CORPORATION,**
Relator,

v.

**COMMISSIONER OF REVENUE,**
Respondent.

No. CX–02–1097.

Supreme Court of Minnesota.

Feb. 6, 2003.

Sue Ann Nelson, Gary Hansen, Robert Stuart, Oppenheimer Wolff & Donnelly LLP, Minneapolis, MN, for Lutheran Brotherhood Research Corporation.

Mike Hatch, Attorney General, Barry R. Greller, Assistant Attorney General, St. Paul, MN, for Commissioner of Revenue.

## OPINION

HANSON, Justice.

Relator Lutheran Brotherhood Research Corporation (LBR) filed corporate franchise tax returns for the tax years 1992, 1993 and 1994 which attributed to Minnesota 100 percent of the fees collected by LBR and its wholly-owned subsidiary, Lutheran Brotherhood Securities (LBS), based on the location of the mutual

funds that paid those fees. Subsequently, LBR filed amended returns claiming refunds by attributing to Minnesota only between 12 and 30 percent of the fees, based on the percentage of mutual fund investors who were located in Minnesota. LBR argued that this attribution was appropriate under the statutory provision that "[r]eceipts from the performance of services must be attributed to the state in which the benefits of the services are consumed." Minn.Stat. § 290.191, subd. 5(j) (1988). Respondent Commissioner of Revenue (Commissioner) denied the refunds, concluding that LBR/LBS's services were consumed by the trustee of the mutual funds, not by the ultimate investors, and that the trustee was located in Minnesota. The tax court granted summary judgment for the Commissioner, finding that all of the fees collected by LBR/LBS were properly apportioned to Minnesota. *Lutheran Brotherhood Research Corp. v. Com'r of Revenue*, No. 7285, 2002 WL 1150102, at *5 (Minn. T.C. May 8, 2002) (*LBR*). By certiorari on the relation of LBR, we review the decision of the tax court and affirm.

Lutheran Brotherhood, the ultimate parent of all of the Lutheran Brotherhood entities involved in this case, is a fraternal benefit society organized and existing under Minnesota law. During 1992, 1993 and 1994, Lutheran Brotherhood operated a group of six mutual funds referred to as the Lutheran Brotherhood Family of Funds (LB Family).

Prior to July 15, 1993, each of the six funds in LB Family was separately incorporated under the laws of either Maryland or Minnesota. Each fund elected to be treated as a regulated investment company for federal and state income tax purposes. For 1992 and until November 1993, each of the six funds contracted directly with LBR and LBS for management services. Several of the service contracts for that period recited that the principal place of business of LBR, LBS and each of the six funds was in Minnesota.

On July 15, 1993, LB Family was reorganized as a Delaware business trust and, on October 28, 1993, the investors approved a further reorganization whereby the six funds became sub-trusts of the LB Family trust. LB Family was registered as an open-end management company under the federal Investment Company Act, 15 U.S.C. §§ 80b–1 to 80b–21 (1992) (the 1940 Act).

As a trust, LB Family had no employees but had a president and a board of seven trustees, the majority of whom were residents of Minnesota. LB Family's assets were held by a custodian, the State Street Bank, in Massachusetts. Under the Master Trust Agreement, the principal office of the trust was in Minnesota; the purpose of the trust was to operate as an investment company, offering investment shares in the trust and each sub-trust; the trustees were given the power to manage the business of the trust, acting "as principals * * * free from the control of the shareholders"; and the trustees were authorized to enter into contracts for the "performance and assumption of some or all of the following services, duties and responsibilities to, for or on behalf of the trust," including advisory, administration, distribution, custodial and transfer services. Effective November 1, 1993, LB Family entered into four contracts with LBR/LBS.

First, LB Family entered into an Investment Advisory Contract with LBR pursuant to which LBR provided investment research, evaluation and supervision of each fund's investments. LB Family paid LBR a fee for those services. LB Family did not pass that fee directly to investors, but instead deducted it from the net asset value of each fund. The contract recited

that LB Family and LBR each had its principal place of business in Minnesota.

Second, LB Family entered into three contracts with LBS: (1) a Distribution Contract for the sale of shares of the funds, (2) a Transfer Agent and Service Contract for transferring shares to and from the funds and disbursing dividends, and (3) an Administration Contract for the administration of the operations of LB Family. Each contract recited that LB Family and LBS each had its principal place of business in Minnesota. Fees for these services were paid to LBS in one of two ways: (1) some were paid directly by investors (e.g., commissions paid under the Distribution Contract were "front-end loaded" and were deducted from the investor's initial investment; some transfer fees and some miscellaneous fees charged under the Administration Contract were charged directly to the investors who used specific services), and (2) some were paid monthly by LB Family to LBS and were then passed on to investors indirectly by a deduction from the net asset value of each fund. By a Stipulation of Settled Issues, the parties agreed that the revenue received by LBS from fees paid directly by investors should be sourced to the states where the investors were located, and these fees are not at issue here.

LBS filed timely combined Minnesota franchise tax returns for 1992, 1993 and 1994. The original returns attributed 100 percent of the disputed fees to Minnesota. LBR subsequently filed timely amended Minnesota franchise tax returns which attributed the disputed fees "based on the location or residency of the investors" in each fund, which ranged from 12 to 30 percent. LBR claimed refunds totaling $604,911.

The Commissioner denied LBR's refund claims. On LBR's appeal, the tax court granted summary judgment for the Commissioner, finding that LBR/LBS's services were "consumed" by LB Family, not by its investors, and that LB Family was located in Minnesota. *LBR*, 2002 WL 1150102, at *5. The court also denied LBR's request for an alternative method of apportionment under Minn.Stat. § 290.20 (1992). *LBR*, 2002 WL 1150102, at *6. The court then examined and rejected all three of LBR's constitutional arguments. *Id.* at *6–9. The court's holdings on each of these five issues were based on its conclusion that LB Family, "and not the individual investors, is the consumer of [LBR]'s services." *Id.* at *6.

Because the parties do not dispute the relevant facts, these issues present questions of law which this court reviews de novo. *State Farm Mut. Auto. Ins. Co. v. Great West Cas. Co.*, 623 N.W.2d 894, 896 (Minn.2001).

I.

At all relevant times, the attribution statute provided:

Receipts from the performance of services *must be attributed to the state in which the benefits of the services are consumed.* If the benefits are consumed in more than one state, the *receipts* from those benefits must be apportioned to this state pro rata according to the portion of the benefits consumed in this state. If the extent to which the benefits of services are consumed in this state is not readily determinable, the benefits of the services shall be deemed to be consumed at the location of the *office* of the customer from which the *services were ordered* in the regular course of the customer's trade or business. If the ordering office cannot be determined, the benefits of the services shall be deemed to be consumed at the *office*

of the customer to which the *services are billed.*

Minn.Stat. § 290.191, subd. 5(j) (1988) (emphasis added).

The Commissioner and the tax court determined that LBR/LBS's services were consumed in Minnesota because they were consumed by LB Family and LB Family was located in Minnesota. As to the location of LB Family, there is no serious dispute. LB Family's offices were in Minnesota, and it recited in contracts that its principal place of business was Minnesota.

The dispute concerns whether LB Family was the "consumer" of the benefits of LBR/LBS's services. LBR argues that LB Family should not be considered the consumer because it was only a conduit of the benefits of those services to the fund investors, who are located across the nation. Focusing on the statutory term "benefits," LBR argues that although LB Family contracted, was billed and paid for the disputed services, the services ultimately benefited the fund investors and they should be viewed as the "beneficial consumers" within the meaning of subdivision 5(j).

LBR supports this argument by first suggesting that the 1987 amendment that created the controlling version of subdivision 5(j) was intended to change the method of sourcing receipts from the sale of services from a "cost of performance" approach (where service fee income was sourced to the state in which the services were performed) to a "market state" approach (where service fee income is sourced to the state in which the benefits of these services are consumed). While this may have been the intent of the 1987 amendment, and the change makes it clear that the location of LBR/LBS (as performers of the services) is not relevant, we do not agree that this change provides a rationale for choosing between LB Family, as the immediate consumer, and the investors, as the ultimate beneficiaries.

LBR next relies on two decisions of this court that recognize the conduit nature of a mutual fund for purposes of determining an investor's tax liabilities. *Yurista v. Comm'r of Revenue* concerned the taxability of an individual investor's dividends from mutual funds that held tax-exempt United States treasury notes and bonds. 460 N.W.2d 24, 25 (Minn.1990). We recognized that the dividends reflected interest earned on these tax-exempt securities. *Id.* at 27. We held that the portion of the mutual fund dividends that was directly attributable to interest earned on the tax-exempt securities remained tax exempt when received by Yurista. *Id.* at 25–28. In *Meunier v. Minnesota Dep't of Revenue,* we summarized *Yurista* as holding that "[i]n lay terms the regulated investment company becomes a conduit through which the federal interest exemption is passed to its shareholders." *Meunier,* 503 N.W.2d at 129. But in *Yurista* and *Meunier* the narrow question was whether state taxation of these dividends would frustrate the principle of federal-tax exemption. Thus, we agree with the tax court that the *Yurista* and *Meunier* decisions were made in a different context, were narrow in scope, and have limited relevance to this case. *LBR,* 2002 WL 1150102, at *4.

Finally, LBR refers us to the tax laws of some other states that attribute mutual-fund service fees to the location of the fund investors. But none of these states do so on the basis of statutory language similar to Minn.Stat. § 290.191, subd. 5(j). In New York, for example, the attribution statute specifically establishes a methodology for attributing income from services rendered to mutual funds. *See* N.Y. Tax Law § 210, subds. 3(a)(2)(ii), 3(a)(6) (2000).

The tax laws of these states offer little guidance on the proper interpretation of the broad terms of Minnesota's attribution statute.

■ To apply the plain language of the statute, we must determine whether the benefits of mutual fund services were consumed by LB Family in Minnesota or by the investors in various states. We conclude that these services were consumed by LB Family and, thus, that the revenue received by LBR/LBS as fees for services rendered to LB Family was properly allocated entirely to Minnesota.

LB Family is a separate legal entity with more than a nominal existence. LB Family has a president, a board of directors, an office and legal title to substantial assets; it can enter (and has entered) into contracts; it can sue and be sued; and it assumed significant fiduciary duties that cannot be avoided by delegation. LB Family's own Master Trust Agreement confers upon it the responsibility to manage the assets "as principals, * * * free from the control of the shareholders." We would have difficulty, under these facts, disregarding the separate legal existence of LB Family.

Further, when we examine the structure and operation of mutual funds generally, as LBR invites us to do, we are persuaded that a mutual fund could not exist without some separate entity that is responsible to hold and manage the fund's assets and to act as an intermediary between investors and the investment advisor.

First, mutual funds are designed to attract smaller investors by pooling their investments to provide economies of scale, professional management and diversification. *See* David E. Riggs and Charles C.S. Park, *Mutual Funds: A Banker's Primer*, 112 Banking L.J. 757, 785 (September 1995).[1] In order to pool these investments, there must be an entity that takes responsibility to hold and manage them.

Second, the numerous unrelated investors do not generally create the fund by searching each other out. Instead, the fund is typically sponsored by an investment advisor, who wants to create another market for its services. *Id.* at 763. The investment advisor does not take the responsibility to hold and manage the investments, but instead creates the mutual fund as a separate legal entity to do so. *Id.* at 766. And in order to assure investors that the investment advisor will not engage in self-dealing to their detriment, the 1940 Act requires that the mutual fund be separate, not only in legal form, but also in responsibilities. Riggs and Park, 112 Banking L.J. at 766. Thus, the fund must have its own board of directors or trustees, at least 40 percent of whom are to be "disinterested," and those disinterested directors or trustees must "annually approve the funds' contracts, including the compensation payable, with its investment adviser and distributor." *Id.* (citing the 1940 Act, § 10(a)). The fund directors must "continuously monitor the performance of the funds' service providers." Riggs and Park, 112 Banking L.J. at 766. In fact, the disinterested directors are viewed by the SEC as the "watchdogs for fund shareholders." *Id.*[2]

---

1. LBR relies upon this source as providing an authoritative description of mutual funds and the Commissioner makes no objection.

2. The reorganization of LB Family as a business trust instead of a corporation did not diminish these substantial responsibilities. Typically, funds are organized either as partnerships, corporations or business trusts, with the choice of legal form usually made by the investment advisor for its convenience. Riggs and Park, 112 Banking L.J. at 764–65. Because partnerships impose accounting and reporting burdens, and standard business corporations require annual meetings and share-

Finally, the record shows that the trustees of LB Family set the investment objectives of each of the six funds. These investment objectives are described as "the heart of the bargain between the investor and the investment advisor." *Id.* at 774.

Hence, it is inaccurate to describe LB Family as "solely" or "merely" a conduit, particularly as it relates to obtaining advisory, distribution, transfer and administrative services. LB Family has undertaken the legal obligation to provide those services to investors and LB Family serves its own needs when it contracts to have that obligation performed on its behalf by LBR and LBS. While investors benefit generally from the management of the mutual fund, the investors derive no particular benefit from the fact that LB Family contracts to have those management services performed by LBR/LBS instead of performing those services itself. Thus, we conclude that LB Family is the consumer of the benefits of the services of LBR/LBS, and the fees received by LBR/LBS for those services are appropriately attributed to Minnesota as the location of LB Family.

## II.

LBR raises four further arguments, one statutory and three constitutional.

### A. *Minn.Stat. § 290.20*

■ Under Minn.Stat. § 290.20, [t]he methods prescribed by section 290.191 shall be presumed to determine fairly and correctly the taxpayer's taxable net income allocable to this state. If the methods prescribed by section 290.191 do not fairly reflect all or any part of taxable net income allocable to

this state, the taxpayer may petition for or the commissioner may require the determination of net income by the use of another method, if that method fairly reflects net income.

Minn.Stat. § 290.20 (2002). The tax court held that because the services provided by LBR and its subsidiary were consumed within the state of Minnesota, the attribution of 100 percent of the fee income to Minnesota fairly reflects its income allocable to this state. *LBR*, 2002 WL 1150102, at *6. LBR's disagreement with this holding is based on the same argument as above—that it is "unfair" because a mutual fund is merely a conduit. But because LB Family is the beneficial consumer of LBR/LBS's services, we conclude that the attribution applied by the Commissioner "determine[s] fairly and correctly the taxpayer's taxable net income allocable to this state." Minn.Stat. § 290.20 (2002).

### B. Commerce Clause

■ A state's taxation system violates the Commerce Clause of the United States Constitution if the income attributed to the state is "out of all appropriate proportions to the business transacted in that State." *Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 170, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) (quoting *Hans Rees' Sons, Inc. v. North Carolina ex rel. Maxwell*, 283 U.S. 123, 135, 51 S.Ct. 385, 75 L.Ed. 879 (1931)).

■ The proportionality test has two prongs, "internal consistency" and "external consistency." *See Container Corp.*, 463 U.S. at 169–70, 103 S.Ct. 2933. LBR questions only the external consistency of the Commissioner's position. A tax system is externally consistent when "the fac-

holder approval of increases in authorized capital, there appears to have been a trend toward organizing mutual funds as business trusts for flexibility: regular shareholder

meetings are not required; the directors can increase authorized capital as the fund grows, without a shareholder vote; and share certificates need not be issued. *Id.*

tor or factors used in the apportionment formula * * * actually reflect a reasonable sense of how income is generated." *Id.* at 169, 103 S.Ct. 2933; *see also Westinghouse Elec. Corp. v. Comm'r of Revenue,* 398 N.W.2d 530, 537 (Minn.1986) (quoting *id.*).

■ Because 100 percent of LBR/LBS's services at issue are consumed by LB Family in Minnesota, all of the commerce at issue arises (and the "income is generated") entirely in Minnesota. As such, we conclude that there is no Commerce Clause violation.

### C. Due Process Clause

■ The Due Process Clause of the Fourteenth Amendment requires that the income attributed to a state for tax purposes be rationally related to "values connected with the taxing State." *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 273, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978) (quoting *Norfolk & Western Ry. Co. v. Missouri State Tax Comm'n,* 390 U.S. 317, 325, 88 S.Ct. 995, 19 L.Ed.2d 1201 (1968)). This doctrine is difficult to distinguish from the Commerce Clause tests discussed above; in fact, several courts conflate the two clauses. *See, e.g., Container Corp.,* 463 U.S. at 169–70, 103 S.Ct. 2933; *Westinghouse Elec. Corp.,* 398 N.W.2d at 537. We conclude that there is no Due Process Clause violation.

### D. Equal Protection and Uniformity Clauses

The scope of protection afforded under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Uniformity Clause, art. X, § 1 of the Minnesota Constitution is identical. *Kuiters v. County of Freeborn,* 430 N.W.2d 461, 463 (Minn.1988). Under both clauses, we have held

[t]he test to determine the constitutionality of statutory classifications includes three primary elements: (1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is, there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; (3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

*Miller Brewing Co. v. State,* 284 N.W.2d 353, 356 (Minn.1979).

The parties agree that when a Minnesota broker provides investment advice directly to an out-of-state investor, the broker's fees are properly attributed to the state in which the investor is located. LBR argues that differentiating between such broker services and similar services provided via a Minnesota mutual fund intermediary is irrational and thus unconstitutional differential treatment. The Commissioner replies that LB Family is itself a customer of LBR and that he is therefore treating Minnesota customers—whether they be individuals or mutual funds—alike.

■ Because LB Family is the consumer of the services at issue, its very existence demonstrates that LBR and direct service providers are not similarly situated. The Commissioner's standard therefore treats all Minnesota vendors and consumers equally and there is no Equal Protection Clause violation.

Affirmed.