STATE OF MINNESOTA

IN SUPREME COURT

A25-0058

Tax Court                                                                                    Procaccini, J.

Humana MarketPoint, Inc.,

                Relator,

vs.                                                                                    Filed: September 24, 2025
                                                    Office of Appellate Courts

Commissioner of Revenue,

                Respondent.

_____

Masha M. Yevzelman, Dylan B. Saul, Fredrikson & Byron, P.A., Minneapolis, Minnesota, for relator.

Keith Ellison, Attorney General, Jennifer A. Kitchak, Assistant Attorney General, Saint Paul, Minnesota, for respondent.

_____

S Y L L A B U S

1.      Under Minnesota Statutes section 290.191, subdivision 5(j) (2024), which prescribes that "[r]eceipts from the performance of services must be attributed to the state where the services are received," the term "received" is not limited to receipt by a direct customer.

1

2. Under the unique circumstances of this case, and because the taxpayer failed to meet its burden to prove that the Commissioner of Revenue's tax assessment was invalid, the tax court did not err by granting summary judgment to the Commissioner.

Affirmed.

_____

O P I N I O N

PROCACCINI, Justice.

Under Minnesota's corporate franchise tax statute, a multistate business's income from services is attributed to the state where the services are "received." Minn. Stat. § 290.191, subd. 5(j) (2024).[1] In this case, we review whether the tax court correctly determined that certain pharmacy benefit management services were "received" in Minnesota for the purpose of attribution.

At issue here is a combined Minnesota franchise tax return filed by relator Humana MarketPoint, Inc. (MarketPoint), Humana Pharmacy Solutions, Inc. (HPS), and other subsidiaries of Humana, Inc. (Humana) for the tax year ending December 31, 2016. HPS received compensation from Humana Insurance Company (HIC) in exchange for pharmacy benefit management services. MarketPoint initially attributed receipts from HPS's services to Minnesota based on the number of HIC plan members who filled prescriptions

---

[1] Although the tax dispute in this case involves tax year 2016, we cite to the current 2024 version of Minnesota Statutes section 290.191, subdivision 5(j), which has not been amended since 2016. To the extent any other statutes cited in this opinion have been amended since 2016, we have indicated so by instead citing to the most recent version of Minnesota Statutes before the amendment.

in Minnesota in 2016. MarketPoint later amended its tax return, changing course and attributing the receipts from HPS's services to Wisconsin, the location of HIC's headquarters. Based on this change, MarketPoint sought a refund of $830,884, plus interest. Respondent—the Commissioner of the Minnesota Department of Revenue—denied MarketPoint's refund claim in full, and MarketPoint appealed by filing a complaint in district court. The district court transferred the case to the tax court, the parties cross-moved for summary judgment after stipulating to undisputed facts, and the tax court granted the Commissioner's motion.

MarketPoint argues that its receipts from services must be attributed to Wisconsin, where its direct customer (HIC) received the services. We conclude that the meaning of "received" under section 290.191, subdivision 5(j), is not limited to receipt by a taxpayer's direct customer. Because the parties agreed that the receipts at issue from HPS's services must be sourced together, MarketPoint therefore needed to prove that *all* of HPS's services were received outside of Minnesota to be entitled to summary judgment. And because the undisputed facts show that HPS's services were received by both HIC plan members in Minnesota and HIC in Wisconsin, the tax court did not err when it concluded that MarketPoint failed to meet its burden to show that HPS's services were received entirely outside of Minnesota. We therefore affirm.

**FACTS**

The relevant facts are set forth in the parties' undisputed stipulations and exhibits.[2] Humana is a "health and well-being company" that provides healthcare-related services to customers across the country through several subsidiaries. MarketPoint is a subsidiary of Humana. MarketPoint and other Humana subsidiaries filed a combined Minnesota corporate franchise tax return for the tax year ending December 31, 2016.

HPS was one of the subsidiaries included in the 2016 tax return. HPS is a pharmacy benefit manager. A pharmacy benefit manager is "a person, business, or other entity that contracts with a [health] plan sponsor to perform pharmacy benefits management," which includes "contracting directly or indirectly with pharmacies to provide prescription drugs to enrollees or other covered individuals;" "administering a prescription drug benefit;" "processing or paying pharmacy claims;" and "administering rebates on prescription drugs[.]" Minn. Stat. § 62W.02, subd. 15 (2024). Similar to other pharmacy benefit managers, HPS contracts with health insurance providers, establishes "networks of participating retail and mail order pharmacies," and "operat[es] a system for processing, fulfillment, and payment of claims for prescription drugs furnished by the pharmacies."

---

[2] When reviewing a grant of summary judgment, "we view the evidence in the light most favorable to the party against whom summary judgment was granted." *Bond v. Comm'r of Revenue*, 691 N.W.2d 831, 836 (Minn. 2005). Because the material facts here are undisputed, "the only question before us is whether the tax court correctly applied Minnesota law." *Billion v. Comm'r of Revenue*, 827 N.W.2d 773, 777 (Minn. 2013).

In 2012, HPS entered into a Pharmacy Benefit Management Services Agreement (the Agreement) with another Humana subsidiary, HIC.[3] HIC is a Wisconsin corporation with a headquarters in Wisconsin and a fixed place of business in Minnesota. It provides life and health insurance to individuals and employer groups nationwide. As a health insurer, HIC provides medical and drug insurance coverage to members of its insurance plans (HIC plan members). HIC also contracts with the Centers for Medicare & Medicaid Services to offer Medicare Advantage and Medicare Part D prescription drug plans to Medicare beneficiaries. Because HIC offers these drug plans, it must comply with various federal requirements, including filing regular reports and facilitating periodic audits. During 2016, the tax year at issue, HIC provided medical and drug insurance coverage to its plan members, who were located within and outside of Minnesota, in exchange for insurance premiums paid for by plan members.

The Agreement required HPS to perform dozens of services to help HIC fulfill its obligations to the federal government, on the one hand, and to help HIC plan members receive their benefits and prescription drugs, on the other. These services included maintaining a network of participating retail, mail order, and specialty pharmacies and adjudicating plan members' claims when they sought to use their benefits at pharmacies. They also included helping HIC design its drug plans, obtaining rebates from pharmaceutical companies, and fulfilling various federal reporting and auditing

---

[3] Other Humana affiliates were also parties to the Agreement, but their involvement in the provision of pharmacy benefit management services to HIC is not relevant to this appeal.

requirements. The services further included a variety of administrative services, such as creating and maintaining customer services programs to help plan members receive and optimize plan benefits. One such program was a toll-free telephone hotline that plan members, their caregivers, and their physicians could call directly with questions about their drug plans.

The Agreement provided that HIC would compensate HPS in two ways. First, HIC would reimburse HPS for amounts it paid to participating pharmacies when those pharmacies dispensed prescriptions to plan members. These payments were referred to as "covered drug reimbursements." Second, HIC would pay HPS service provider fees based on the number of prescriptions that were dispensed to plan members.[4] These fees were referred to as "base service provider fees." In 2016, as it pertains to Minnesota plan members, HIC paid HPS $315,742,883 in covered drug reimbursements and $5,789,746 in base service provider fees.

In 2017, MarketPoint and other Humana subsidiaries, including HPS, filed a combined Minnesota corporate franchise tax return for the tax year ending December 31, 2016. This tax return attributed receipts from services that HPS performed under the Agreement to the state where the HIC plan member resided when the plan member purchased the drug plan.[5] The tax court and parties have referred to this approach as the "look-through" apportionment method, because it requires the taxpayer to "look through"

---

[4] The amount paid per prescription varied based on the type of drug plan.

[5] MarketPoint used this same apportionment method in calculating HPS's Minnesota corporate franchise tax liability in 2012, 2013, 2014, and 2015.

the direct customer (here, HIC) to the "ultimate customer" (here, HIC plan members) to determine where the taxpayer's services were received. Based on this apportionment method, MarketPoint determined that HPS received $279,726,839 for its services in Minnesota in 2016.[6] MarketPoint then used this amount to calculate HPS's sales factor—the receipts from HPS's in-state services divided by HPS's total receipts—and determine how much of HPS's income was attributable to (and therefore taxable in) Minnesota in 2016. HPS reported total receipts of more than $28 billion and a Minnesota sales factor of 0.9919 percent.

Nearly four years later, in April 2021, MarketPoint filed an amended corporate franchise tax return/claim for refund that attributed all receipts from services HPS performed under the Agreement to Wisconsin, the state where HIC was headquartered in 2016. Accordingly, MarketPoint determined that HPS received nothing for its services in Minnesota in 2016, and it therefore recalculated HPS's Minnesota sales factor to 0.0 percent for that tax year. Based on the new calculation, MarketPoint requested a refund of $830,884, plus interest, for the amount it paid in corporate franchise tax in Minnesota on behalf of HPS in 2016. The Commissioner denied MarketPoint's refund claim.

---

[6] MarketPoint arrived at this amount by adding the covered drug reimbursements ($315,742,883) and base service provider fees ($5,789,746) together and subtracting the rebates it obtained from pharmaceutical companies on behalf of HIC. MarketPoint subtracted the rebates from its other receipts because the Agreement required HPS to remit all of those rebates to HIC.

MarketPoint administratively appealed,[7] and the Commissioner affirmed the denial of the refund claim. The Commissioner concluded that MarketPoint's apportionment method—attributing the receipts from HPS's pharmacy benefit management services to Wisconsin based on the location of HIC, HPS's "direct customer"—was not supported by Minnesota law. The Commissioner further concluded that the look-through apportionment method—which MarketPoint had used for several years—was appropriate.

MarketPoint appealed the Commissioner's determination by filing a complaint in district court. The district court transferred the case to the tax court, and the parties cross-moved for summary judgment. Along with their briefs, the parties submitted a partial stipulation of material facts, a second partial stipulation of material facts, and six stipulated exhibits.[8] In a second partial stipulation of material facts, the parties stipulated that all of the $279,726,839 in receipts at issue, "whether from Covered Drug Reimbursements or Base Service Provider Fees, should be sourced together."

When it moved for summary judgment, MarketPoint argued that the Commissioner erred by denying its refund claim because HPS's receipts were not attributable to Minnesota under the Services Sourcing Statute, Minnesota Statutes section 290.191, subdivision 5(j). The Services Sourcing Statute provides that "[r]eceipts from the

---

[7]    A taxpayer may file an administrative appeal with the Commissioner of Revenue within 60 days of an order denying a refund. Minn. Stat. § 270C.35, subds. 3–4 (2024).

[8]    The stipulated exhibits comprised Humana's Annual Report; the Agreement; a delegation agreement between HPS and another Humana subsidiary; MarketPoint's Amended Franchise Tax Return; the Commissioner's Determination on Appeal; and a page from a spreadsheet MarketPoint used to prepare its 2016 tax return.

performance of services must be attributed to the state where the services are received." Minn. Stat. § 290.191, subd. 5(j). MarketPoint argued that, under the plain language of the statute, HPS's services were received by HIC in Wisconsin, not HIC plan members in Minnesota. MarketPoint also asserted that the look-through apportionment method was an alternative method of apportionment and that the Commissioner did not meet his statutory burden to show that this method fairly reflected HPS's taxable income for 2016. *See* Minn. Stat. § 290.20, subd. 1 (2024) ("If the methods prescribed by section 290.191 do not fairly reflect all or any part of taxable net income allocable to this state, the taxpayer may petition for or the commissioner may require the determination of net income by the use of another method, if that method fairly reflects net income.").

In his motion for summary judgment, the Commissioner argued that he correctly denied MarketPoint's refund claim because, under the plain language of the Services Sourcing Statute, HPS's services were received by HIC plan members in Minnesota, not by HIC in Wisconsin.

The tax court granted the Commissioner's motion for summary judgment and denied MarketPoint's motion for summary judgment. *Humana MarketPoint, Inc. v. Comm'r of Revenue* (*Humana*), No. 9570-R, 2024 WL 4997432, at \*1 (Minn. T.C. Nov. 21, 2024). The tax court rejected MarketPoint's interpretation of the Services Sourcing Statute and instead concluded that the plain language of the statute "does not limit receipt of services for attribution purposes to 'direct customers' of the taxpayer." *Id.* at \*19. Instead, the tax court concluded that "the determination of who received services is fact specific." *Id.* Applying this interpretation of the statute to the undisputed facts, the

9

tax court concluded that MarketPoint failed to prove an essential element of its claim because it failed to show that the services performed in exchange for the covered drug reimbursements "were provided only to and received only by HIC at locations outside Minnesota." *Id.* at *20. Because the parties stipulated that the covered drug reimbursements and base service provider fees at issue should be sourced together, and because MarketPoint failed to show that all of HPS's services were received outside of Minnesota, the tax court granted the Commissioner's motion for summary judgment.[9] *Id.* at *22.

MarketPoint appealed. *See* Minn. Stat. § 271.10, subd. 1 (2024) (authorizing our direct review of tax court decisions).

**ANALYSIS**

MarketPoint argues that the tax court erred by granting the Commissioner's motion for summary judgment and by denying MarketPoint's motion for summary judgment. Generally, our review of a tax court decision is " 'limited and deferential.' " *Associated Bank, N.A. v. Comm'r of Revenue*, 914 N.W.2d 394, 400 (Minn. 2018) (quoting *Minn. Energy Res. Corp. v. Comm'r of Revenue*, 886 N.W.2d 786, 792 (Minn. 2016)).[10] But we

---

[9]    The tax court did not address MarketPoint's alternative claim that the Commissioner failed to show that his alternative method of apportionment fairly reflected HPS's taxable income for 2016. *See Humana*, 2024 WL 4997432, at *22 (citing *Lubbers v. Anderson*, 539 N.W.2d 398, 402 n.3 (Minn. 1995), for the proposition that a court need not decide remaining issues when it determines that a party was entitled to summary judgment).

[10]    "We review tax court decisions to determine whether the tax court lacked subject matter jurisdiction, whether the tax court's decision is supported by evidence in the record, and whether the tax court made an error of law." *Associated Bank*, 914 N.W.2d at 400 (citation omitted) (internal quotation marks omitted).

review de novo the tax court's legal conclusions, including its interpretation of a statute and its application of the law to undisputed facts. *HMN Fin., Inc. v. Comm'r of Revenue*, 782 N.W.2d 558, 563 (Minn. 2010); *Walgreens Specialty Pharmacy, LLC v. Comm'r of Revenue*, 916 N.W.2d 529, 532 (Minn. 2018). And when the tax court grants summary judgment, as it did here, we also apply a de novo standard of review. *Walgreens*, 916 N.W.2d at 532.

MarketPoint contends that the tax court erred by granting the Commissioner's motion for summary judgment because, for purposes of multistate business income apportionment under the Services Sourcing Statute, HPS's pharmacy benefit management services were "received" by HIC in Wisconsin, not HIC plan members in Minnesota. To determine whether the tax court erred, we first interpret the "received" language in the Services Sourcing Statute and then apply that interpretation to the circumstances presented here.

I.

MarketPoint argues that the tax court misinterpreted the "received" language in the Services Sourcing Statute because the term plainly requires receipt by a direct customer and is not broad enough to encompass receipt by a customer's customer. Based on this interpretation, MarketPoint contends that HPS's income from its pharmacy benefit management services was improperly apportioned to Minnesota, when it should have been fully apportioned to Wisconsin. We begin by providing an overview of apportionment in Minnesota before addressing MarketPoint's arguments regarding the Services Sourcing Statute.

11

A.

The Due Process and Commerce Clauses of the United States Constitution prohibit a state from imposing income tax on "value earned outside its borders." *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 164 (1983) (citation omitted) (internal quotation marks omitted); *see also YAM Special Holdings, Inc. v. Comm'r of Revenue*, 947 N.W.2d 438, 442 (Minn. 2020) (citing *Container Corp.* for this proposition); U.S. Const. amend. XIV, § 1; U.S. Const. art. I, § 8, cl. 3. But determining how much income a multistate business earns in a given state "is often an elusive goal." *Container Corp.*, 463 U.S. at 164. In recognition of the theoretical and practical challenges that arise when determining how much of a multistate business's income should be taxed in each state, the United States Supreme Court has held that the Constitution does not require a "single formula" for apportioning multistate business income. *Id.* A state may levy a tax without violating the Constitution if the tax, in its "practical operation," is commensurate with the protection, opportunities, and benefits the state has conferred upon the taxpayer. *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 444 (1940); *see also Anderson v. Lappegaard*, 224 N.W.2d 504, 508 (Minn. 1974) ("The test of whether a tax law violates the due process clause is whether it bears some fiscal relation to the protection, opportunities, and benefits given by the state . . . .").

Minnesota has "adopted the unitary business principle and apportionment approach" for determining the portion of multistate business income that is subject to

12

taxation in our state.[11]  *YAM Special Holdings*, 947 N.W.2d at 442; *see* Minn. Stat. § 290.17, subds. 3–4 (2024).  Minnesota defines "unitary business" as "business activities or operations which result in a flow of value between them."  Minn. Stat. § 290.17, subd. 4(b).  This definition can be applied to a single legal entity or multiple legal entities, without regard to their legal structure.  *Id.*  When a unitary business operates in Minnesota and other states, "the entire income of the unitary business is subject to apportionment pursuant to section 290.191."  *Id.*, subd. 4(a).  Accordingly, when a unitary business is taxable in Minnesota, "an apportionment formula—based on a percentage of the business's Minnesota sales, property, and payroll—[determines] the amount of business income subject to tax."[12]  *YAM Special Holdings*, 947 N.W.2d at 442 (citing Minn. Stat. § 290.191, subd. 2(a) (2018)).

---

[11]    The United States Supreme Court has upheld the constitutionality of the unitary business principle and apportionment approach, " 'subject to certain constraints.' "  *YAM Special Holdings*, 947 N.W.2d at 442 (quoting *Container Corp.*, 463 U.S. at 165).  For instance, under the Due Process and Commerce Clauses of the United States Constitution, a state cannot apportion income from interstate activities unless there is: (1) "a minimal connection or nexus between the interstate activities and the taxing State" and (2) "a rational relationship between the income attributed to the State and the intrastate values of the enterprise."  *Container Corp.*, 463 U.S. at 165–66 (citation omitted) (internal quotation marks omitted); *see also YAM Special Holdings*, 947 N.W.2d at 442.  To satisfy these requirements, the unitary business must be united in ownership or control and must conduct some business within the taxing state that concretely relates to its activities outside of the taxing state.  *Container Corp.*, 463 U.S. at 166; *see also YAM Special Holdings*, 947 N.W.2d at 443.

[12]    Minnesota's apportionment formula applies to all business income but does not apply to nonbusiness income.  Minn. Stat. § 290.17, subd. 3.  Minnesota defines "[n]onbusiness income" as "income of [a] trade or business that cannot be apportioned by [the] state because of the United States Constitution or the Constitution of the state of Minnesota."  Minn. Stat. § 290.17, subd. 6 (2024).  Nonbusiness income "includes income

13

Under Minnesota's apportionment formula, a business's income is apportioned to Minnesota based on "the percentage which the sales made within this state in connection with the trade or business during the tax period are of the total sales wherever made in connection with the trade or business during the tax period." Minn. Stat. § 290.191, subd. 2(a)(1). This equation generates a "sales factor," which is multiplied by the business's total income to identify the portion of that income that is taxable in Minnesota.[13] *Id.* To depict these two calculations visually:

$$\text{Sales Factor} = \frac{\textbf{Minnesota Sales}}{\textbf{Everywhere Sales}}$$

**Sales Factor × Everywhere Income = Minnesota Taxable Income**

The "sales factor is intended to give weight to the states that provide the market for the taxpayer's products ('market' states or 'destination' states)." *Synthes USA HQ, Inc. v. Commonwealth*, 289 A.3d 846, 868 (Penn. 2023) (quoting John A. Swain, *Reforming the State Corporate Income Tax: A Market State Approach to the Sourcing of Service Receipts*, 83 Tul. L. Rev. 285, 288 (2008)).

---

that cannot constitutionally be apportioned to [the] state because it is derived from a capital transaction that solely serves an investment function." *Id.* This case involves only business income.

[13] Minnesota's apportionment formula for a business's income considers a sales factor, property factor, and payroll factor, with the percentage to be allocated to each of those three factors set by a statutory table. Minn. Stat. § 290.191, subd. 2. For "2014 and later calendar years," 100 percent is allocated to the sales factor, with the property factor and payroll factor percentages both set to zero. *Id.*, subd. 2(b). Because only the sales factor is relevant to the 2016 tax year at issue here, we focus exclusively on that factor.

Minnesota's "sales factor includes all sales, gross earnings, or receipts received in the ordinary course of the business," with certain exceptions that do not apply here. Minn. Stat. § 290.191, subd. 5(a) (2018). The Services Sourcing Statute establishes the following framework for attributing receipts from the performance of services:

> Receipts from the performance of services must be attributed to the state where the services are received. For the purposes of this section, receipts from the performance of services provided to a corporation, partnership, or trust may only be attributed to a state where it has a fixed place of doing business. If the state where the services are received is not readily determinable or is a state where the corporation, partnership, or trust receiving the service does not have a fixed place of doing business, the services shall be deemed to be received at the location of the office of the customer from which the services were ordered in the regular course of the customer's trade or business. If the ordering office cannot be determined, the services shall be deemed to be received at the office of the customer to which the services are billed.

Minn. Stat. § 290.191, subd. 5(j). The Services Sourcing Statute is central to this case because it is the basis for setting the numerator of the fraction used to calculate HPS's sales factor, which is required for determining HPS's tax liability in Minnesota.

B.

To resolve the parties' dispute, we must interpret the Services Sourcing Statute. We interpret statutes to ascertain and effectuate the intent of the Legislature. *Associated Bank*, 914 N.W.2d at 402; *see also* Minn. Stat. § 645.16 (2024) (providing guidance on the interpretation of statutes). " 'The plain language of the statute is our best guide to the Legislature's intent.' " *Cities Mgmt., Inc. v. Comm'r of Revenue*, 997 N.W.2d 348, 354 (Minn. 2023) (quoting *Rodriguez v. State Farm Mut. Auto. Ins. Co.*, 931 N.W.2d 632, 634 (Minn. 2019)). When the plain language of a statute is unambiguous, the plain meaning of

15

the statute controls. *Id.* at 354–55. But when the plain language of a statute is susceptible to more than one meaning, it is ambiguous, and we may consider "other interpretative tools to assist our inquiry into legislative intent." *Rodriguez*, 931 N.W.2d at 634.

When considering the plain language of a statute, we construe statutory words and phrases according to their common and approved usage and consistent with the rules of grammar. *Cities Mgmt.*, 997 N.W.2d at 355; *see also* Minn. Stat. § 645.08(1) (2024). If a statute does not define a term, we may consider its ordinary meaning by, for example, looking to dictionary definitions of the term. *Associated Bank*, 914 N.W.2d at 404.

The parties' dispute centers on the first sentence of the Services Sourcing Statute: "Receipts from the performance of services must be attributed to the state where the services are *received*." Minn. Stat. § 290.191, subd. 5(j) (emphasis added). MarketPoint argues that "received" means "directly received," such that receipts from services may be attributed only to a direct customer, not to a customer's customer. The Commissioner disagrees. Like the tax court, the Commissioner contends that "received" does not necessarily imply direct receipt and that receipts from services may be attributed to a customer's customer depending on the nature of the services.

To resolve this dispute, we begin by considering the plain meaning of "received." When determining plain meaning, we first look to the statute for guidance. *See, e.g.*, *Associated Bank*, 914 N.W.2d at 404 (considering the common usage of a term after noting that the statute does not define the term). The Services Sourcing Statute itself does not define "received." Minn. Stat. § 290.191, subd. 5(j). The Tax Code's definitions section provides that, "[u]nless the language or context clearly indicates that a different meaning

16

is intended," "received" "shall be construed according to the method of accounting upon the basis of which net income is computed for the purposes of the taxes imposed by this chapter." Minn. Stat. § 290.01, subds. 1, 11 (2024). But the parties agree, and we concur, that this statutory definition does not help us determine where services are "received" for purposes of apportioning multistate business income from the performance of services. Accordingly, we do not apply this statutory definition of "received" but instead look to dictionary definitions as well as our case law to ascertain the plain meaning of "received" in this context. *See Associated Bank*, 914 N.W.2d at 404.

Dictionaries define "receive" to mean "[t]o take (something offered, given, sent, etc.)"; "to come into possession of or get from some outside source"; and to "get or be given." *Receive*, *Black's Law Dictionary* 1523 (12th ed. 2024); *The American Heritage Dictionary of the English Language* 1467 (5th ed. 2011) (defining "receive"). These definitions comport with our recent decision in *Dakota Drug, Inc. v. Commissioner of Revenue*, 13 N.W.3d 387 (Minn. 2024). In that case, we interpreted Minnesota Statutes section 295.50, subdivision 3 (2018),[14] which defines "[g]ross revenues" as the "total amounts received in money or otherwise" by certain healthcare providers. *Dakota Drug*, 13 N.W.3d at 392; *see also* Minn. Stat. § 295.50, subd. 3. When interpreting "received," we explained that the term "ordinarily means 'to come into possession of' or 'acquire.' " *Id.* (quoting *Merriam Webster's Collegiate Dictionary* 1038 (11th ed. 2014) (defining

---

[14] Although this statute has been amended since we decided *Dakota Drug*, the relevant statutory language has remained the same. *Compare* Minn. Stat. § 295.50, subd. 3 (2018), *with id.* (2024).

17

"received")). We then relied on this and other definitions to conclude that the term "received," as it is used to calculate "[g]ross revenues" under section 295.50, subdivision 3, means to "come[] into possession of or get[] from some outside source." *Dakota Drug*, 13 N.W.3d at 392. Based on the dictionary definitions above and our recent interpretation of "received" in *Dakota Drug*, we conclude that "received" as it is used in the Services Sourcing Statute plainly means "to come into possession of or get from some outside source."

MarketPoint largely agrees with this interpretation of "received." This interpretation does not limit "received" to mean "to come *directly* into possession of or get from some outside source." And MarketPoint has not pointed to definitions of "receive" that exclude receipt by indirect beneficiaries. Nevertheless, MarketPoint contends that "services can only be 'received' for purposes of the Services Sourcing Statute at the location of the *direct recipient* of the services—the person who takes possession of, acquires, or directly experiences the services—and not an indirect beneficiary who may ultimately benefit from the services." (Emphasis added.) MarketPoint argues that the structure of the Services Sources Statute as well as a different subdivision of the statute—Minnesota Statutes section 290.191, subdivision 5(k) (2018)—require us to interpret "received" to mean "*directly* received." (Emphasis added.) As we explain below, we are not persuaded by MarketPoint's more limited definition of "received."

The tax court explained—and the parties agree—that the Services Sourcing Statute creates a set of "cascading" or "deem[ing]" rules that identify where to source receipts from the performance of services if the location cannot be determined based on a previous rule.

18

*Humana*, 2024 WL 4997432, at \*14–15.  MarketPoint asserts that these three cascading steps, read as a whole, "reflect[] the Legislature's intent to ultimately source receipts from the performance of services to the customer's physical location—a place where the customer directly received the service."  The Commissioner counters that the terms "direct" and "customer" do not appear in the Services Sourcing Statute and that the statute does not "place any restriction on who receives a service, as long as it is readily determinable where a service is received."

We agree with the Commissioner.  The Services Sourcing Statute creates a cascading set of options for sourcing services to a state, starting with the most precise and preferred option and ending with the least precise and preferred option.  The Services Sourcing Statute first states that "[r]eceipts from the performance of services must be attributed to the state where the services are received."  Minn. Stat. § 290.191, subd. 5(j). If the services are "provided to a corporation, partnership, or trust[,]" then receipts from the performance of those services "may only be attributed to a state where [the corporation, partnership, or trust] has a fixed place of doing business."  *Id.*  The taxpayer moves to the second option if *and only if* "the state where the services are received is not readily determinable" or is a state where the "corporation, partnership, or trust receiving the service does not have a fixed place of doing business."  *See id.*  At this point, the receipts must be attributed to "the office of the customer from which the services were ordered."  *Id.*  The third option operates in the same way:  The analysis moves to the third option if *and only if* the ordering office cannot be determined.  *See id.*  At the third option, the "services shall

19

be deemed to be received at the office of the customer to which the services are billed."
*Id.*

Although the second and third options both source receipts from the performance of services to "the office of the customer," *id.*, MarketPoint's argument that this language demonstrates an intent to source receipts "to the [direct] customer's physical location" is not persuasive. Contrary to this assertion, the structure of the Services Sourcing Statute shows that the Legislature generally intended to source receipts from the performance of services to the state "where the services are received." *Id.* Only if the state "where the services are received" is not "readily determinable" may the Commissioner consider the location of the direct customer. *See id.* Contrary to MarketPoint's argument, this structure implicitly acknowledges that a business's services *may not* be received by the direct customer and may instead be received by the customer's customer.

MarketPoint also argues that section 290.191, subdivision 5(k)—which provides that receipts from the performance of services for a mutual fund must be attributed "to the state where the shareholder of the fund resides" (i.e., to the mutual fund beneficiaries, who are the customer's customer)—is an "exception to the general rule that" receipts from services are attributed only to the "direct recipient." This argument is based on our decision in *Lutheran Brotherhood Research Corporation v. Commissioner of Revenue*, 656 N.W.2d 375 (Minn. 2003), and the Legislature's subsequent adoption of section 290.191, subdivision 5(k). In *Lutheran Brotherhood*, we interpreted a previous version of the Services Sourcing Statute. Under that version of the statute, receipts from the performance of services were "attributed to the state in which the benefits of the services [were]

20

*consumed*." Minn. Stat. § 290.191, subd. 5(j) (1988) (emphasis added). We interpreted this language in the context of mutual fund services, concluding that mutual fund services were "consumed" by the mutual funds themselves and did not pass through to the beneficiaries of the mutual funds (i.e., the customer's customer). *Lutheran Bhd.*, 656 N.W.2d at 380–81.

Five years after we decided *Lutheran Brotherhood*, the Legislature amended section 290.191 by adding subdivision 5(k). Act of May 29, 2008, ch. 366, art. 4, § 13, 2008 Minn. Laws 2093 (codified at Minn. Stat. § 290.191, subd. 5(k) (2008)). Under subdivision 5(k), receipts from services performed for a mutual fund "must be attributed to the state where the shareholder of the fund resides." Minn. Stat § 290.191, subd. 5(k) (2018). This amendment codified the "look-through" approach to sourcing receipts for mutual fund management services—the same approach that we rejected when interpreting subdivision 5(j) in *Lutheran Brotherhood*. *See* 656 N.W.2d at 381. Although we decline to engage in a full interpretation of section 290.191, subdivision 5(k), which is not at issue here, it seems that the Legislature added subdivision 5(k) to supersede *Lutheran Brotherhood* in the context of mutual fund services.

Citing to the legislative record, MarketPoint argues that "[t]he Legislature enacted subdivision 5(k) as an exception or proviso to the Services Sourcing Statute by recognizing that under the [statute], services provided to a fund 'are treated as sales made to the mutual fund itself (i.e., they are sourced to the mutual fund's fixed place of business).' " *See* H.F. 3149, Conf. Comm. Rep. 85-CCRH3149C, Reg. Sess., at 9 (May 21, 2008). The Commissioner contends that MarketPoint's position is not supported for two reasons. First,

21

the Commissioner argues that "*Lutheran Brotherhood* did not prohibit 'look-through' sourcing or establish any rule that services must be received by a 'direct customer.' " Second, the Commissioner asserts that "subdivision 5(k) is silent on the sourcing of receipts from the performance of services in general" and therefore "does not change the meaning of subdivision 5(j)."

Again, the Commissioner has the better argument.[15] *Lutheran Brotherhood* and the adoption of subdivision 5(k) have little bearing on the current language of subdivision 5(j). In *Lutheran Brotherhood*, we interpreted a previous version of the Services Sources Statute, which stated that receipts from services must be sourced to " 'the state in which the *benefits* of the services are *consumed*.' " 656 N.W.2d at 377 (quoting Minn. Stat. § 290.191, subd. 5(j) (1988)) (emphasis added). Today, receipts from services must be sourced to "the state where the *services* are *received*." Minn. Stat. § 290.191, subd. 5(j) (2024) (emphasis added). We presume that distinctions in language in the same context are intentional. *In re Stadsvold*, 754 N.W.2d 323, 328–29 (Minn. 2008). We likewise presume that the Legislature understands "the effect of its words" when it amends statutory

---

[15]    We note that MarketPoint's arguments regarding the Legislature's adoption of section 290.191, subdivision 5(k), following *Lutheran Brotherhood* invokes the legislative history of the Services Sourcing Statute, which we generally consider only when the statutory language is ambiguous. *See Kratzer v. Welsh Cos.*, 771 N.W.2d 14, 21 (Minn. 2009) ("We look beyond the plain language of the statutory or regulatory provision only if the text is ambiguous."); *State v. Thonesavanh*, 904 N.W.2d 432, 439 n.4 (Minn. 2017) (rejecting the concurrence's pre-ambiguity use of a post-ambiguity canon of construction). Because we conclude that the language of the Services Sourcing Statute is unambiguous, MarketPoint's arguments related to subdivision 5(k) are arguably irrelevant. *See Kratzer*, 771 N.W.2d at 21; *Thonesavanh*, 904 N.W.2d at 439 n.4. But because these arguments are central to MarketPoint's position, we nevertheless address them.

language. *ILHC of Eagan, LLC v. County of Dakota*, 693 N.W.2d 412, 419 (Minn. 2005) (citation omitted) (internal quotation marks omitted). These presumptions alone suggest that the Legislature intentionally altered the meaning of the Services Sourcing Statute by changing "benefits . . . consumed" to "services . . . received."

This conclusion is underscored by the common usage of these terms, which we may consider where, as here, the terms are not defined by statute. *See Associated Bank*, 914 N.W.2d at 404. Dictionaries define "benefit" as "[t]he advantage or privilege something gives" and "the helpful or useful effect something has," as well as "[s]omething that promotes or enhances well-being" and "an advantage." *Benefit*, *Black's Law Dictionary* 193 (12th ed. 2024); *The American Heritage Dictionary of the English Language* 168 (5th ed. 2011) (defining "benefit"). By contrast, dictionaries define "service" as "[l]abor performed in the interest or under the direction of others" and "the performance of some useful act or series of acts for the benefit of another." *Service*, *Black's Law Dictionary* at 1647; *see also American Heritage Dictionary* at 1602 (defining "service" to mean "[w]ork that is done for others as an occupation or business"). In the context of the Services Sourcing Statute, "benefit" focuses attention on the entity receiving the services, whereas "service" centers attention on the act that is being received. For practical purposes, the change from "benefit" to "service" suggests that the Legislature intended to shift focus from the entity receiving the service to the service itself.

Such a shift makes sense when we consider the other relevant change in statutory language: the change from "consumed" to "received." Dictionaries define "consume" to mean "[t]o destroy the substance of," "to use up or wear out gradually," and "[t]o take in

23

as food; eat or drink up." *Consume*, *Black's Law Dictionary* at 397; *American Heritage Dictionary* at 395. But, as discussed above, "receive" means "to come into possession of or get from some outside source." The former ("consume") focuses on use or consumption, whereas the latter ("receive") centers on possession. When we read these words in conjunction with "benefit" and "service," the Legislature's intent emerges. In amending "benefits . . . consumed" to "services . . . received," the Legislature indicated an intent to change its focus from where the *customer used* the service to where the *service* was *dispensed*. In so doing, the Legislature changed the meaning of the Services Sourcing Statute. Accordingly, our interpretation of the previous version of the Services Sourcing Statute in *Lutheran Brotherhood* is of only limited value here.

Perhaps even more importantly, *Lutheran Brotherhood* and subdivision 5(k) narrowly apply to receipts for services performed for *mutual funds*. In *Lutheran Brotherhood*, we sought to identify the party who ultimately consumed the benefits of mutual fund management services, focusing solely on the relationship between the management company, the mutual funds, and the mutual fund investors. 656 N.W.2d at 380–81. We did not explain how the "consumed" language of subdivision 5(j) should be interpreted in other contexts. *See id.* Likewise, subdivision 5(k) explains where receipts from services performed "*for a fund*" should be sourced, without referring to subdivision 5(j) or services performed for other entities. Minn. Stat. § 290.191, subd. 5(k) (emphasis added). The limited applicability of *Lutheran Brotherhood* and subdivision 5(k) shows that neither of these laws narrow the interpretation of "received" in the current Services Sourcing Statute in the way that MarketPoint suggests.

24

Finally, we emphasize that neither *Lutheran Brotherhood* nor subdivision 5(k) foreclose the "look-through" approach to sourcing receipts from services performed in other, non-mutual fund contexts. In *Lutheran Brotherhood*, we made clear that determining who "consumed" services was a fact-intensive inquiry centered on who "particular[ly] benefit[ed]" from the services. 656 N.W.2d at 381. On the facts of *Lutheran Brotherhood*, we concluded that the mutual funds—not the mutual funds' investors—consumed the benefits of the mutual fund manager's services. *Id.* We reasoned that "the structure and operation of mutual funds generally" showed that a mutual fund could not exist without an intermediary to provide mutual fund management services. *Id.* at 380. On different facts, we may well have reached a different conclusion. We rejected the look-through approach in *Lutheran Brotherhood* in part because the mutual fund manager did not interact with the mutual fund investors. *Id.* But here, HPS did interact directly with HIC plan members. Because *Lutheran Brotherhood* is both legally and factually distinguishable from the case presented here, we are unpersuaded that *Lutheran Brotherhood* forecloses a look-through approach to sourcing receipts from services in this case.

Regarding subdivision 5(k), that subdivision applies particularly to mutual funds, whereas subdivision 5(j) applies broadly to "services" generally. *See* Minn. Stat. § 290.191, subds. 5(j)–(k). Accordingly, interpretations of subdivision 5(j) do not necessarily apply to interpretations of subdivision 5(k), and vice versa. For these reasons, MarketPoint's arguments related to subdivision 5(k) are also unpersuasive.

In sum, we conclude that "received" as it is used in Minnesota's Services Sourcing Statute—section 290.191, subdivision 5(j)—plainly means "to come into possession of or get from some outside source." The term "received" does not require receipt by a direct customer and instead is broad enough to encompass receipt by a customer's customer.

II.

In view of our interpretation of "received" under the Services Sourcing Statute, we next consider whether the tax court erred when it granted the Commissioner's motion for summary judgment. We review a tax court's grant of summary judgment to determine whether the court erred in its application of the law and whether there is a genuine issue of material fact that is susceptible to resolution at trial. *See Cities Mgmt.*, 997 N.W.2d at 352. Where the material facts are disputed, we "view the evidence in the light most favorable to the party against whom summary judgment was granted." *Bond v. Comm'r of Revenue*, 691 N.W.2d 831, 836 (Minn. 2005). But where the material facts are undisputed, as they are here, we consider only "whether the tax court correctly applied Minnesota law." *Billion v. Comm'r of Revenue*, 827 N.W.2d 773, 777 (Minn. 2013). "We presume that the Commissioner's tax assessments are valid and correct, and the taxpayer has the burden of demonstrating the invalidity or incorrectness of an assessment." *Cities Mgmt.*, 997 N.W.2d at 353.

To determine whether the tax court erred by granting the Commissioner's motion for summary judgment, we must first apply the correct interpretation of "received" to the circumstances here. As we concluded above, for purposes of Minnesota's Services Sourcing Statute, "received" means "to come into possession of or get from some outside

26

source." *See* Minn. Stat. § 290.191, subd. 5(j). Therefore, the questions before us are who came into possession of or got HPS's pharmacy benefit management services during 2016, and in which state the recipient or recipients were located.

The answer is straightforward: HPS's services were received by both HIC in Wisconsin and HIC plan members in Minnesota (and elsewhere).[16] This conclusion is supported by the Agreement itself. The Agreement detailed dozens of services that HPS was expected to provide. These included services that were provided directly to HIC as well as services that were provided directly to HIC plan members. For instance, the Agreement required HPS to help HIC develop its drug plans, obtain rebates from pharmaceutical companies, and comply with HIC's federal reporting and auditing requirements. It is difficult to see how any entity or person other than HIC came into possession of these services. At the same time, the Agreement required HPS to

---

[16] MarketPoint argues that, if we conclude that HPS's services were received both by HIC in Wisconsin and by HIC plan members in Minnesota (as we do), then the location where these services were received would not be "readily determinable" under the Services Sourcing Statute. Minn. Stat. § 290.191, subd. 5(j). Accordingly, MarketPoint asserts that adopting this interpretation of the statute would require us to follow the cascading rules and attribute HPS's receipts to "the office of the customer from which the services were ordered"—HIC's headquarters in Wisconsin. *Id.* As we discuss below, the parties' stipulations contradict this argument. The parties stipulated that the $279,726,839 in receipts at issue from HPS's services should be sourced together and that all of these receipts should be attributed either to Wisconsin, based on the headquarters of HIC, or to Minnesota, based on the location of HIC plan members. In so stipulating, the parties conceded that the location where HPS's services were received was "readily determinable." *Id.* They agree that whether the services were received in Wisconsin or Minnesota depended on the court's legal interpretation of "received," not on a question of material fact. Because the location where the services were received was readily determinable given the parties' stipulations, MarketPoint's alternative argument is unavailing.

communicate directly with HIC plan members to inform them of plan options and changes; to create and maintain a toll-free telephone hotline to answer calls directly from plan members and their caregivers and physicians; and to perform several services to ensure that plan members received their prescriptions. This last category of services included determining the amount that a plan member must pay for each prescription, evaluating how a plan member's prescriptions may interact, and paying pharmacies on behalf of HIC to ensure that plan members received their prescriptions. It is apparent that HIC plan members came into possession of these prescription-related services.

Having determined that HPS's services were "received" by both HIC in Wisconsin and HIC plan members in Minnesota, we next consider whether the tax court erred by granting the Commissioner's motion for summary judgment.

On the unique facts and procedural posture of this case, we conclude that the tax court properly granted summary judgment to the Commissioner. We begin by reiterating that we presume the Commissioner's tax assessments are valid and correct, and that the taxpayer bears the burden of showing that a tax assessment was incorrect. *Cities Mgmt.*, 997 N.W.2d at 353; *see also* Minn. Stat. § 271.06, subd. 6 (2024) ("[T]he order of the commissioner . . . in every case shall be prima facie valid."). In its amended 2016 tax return, MarketPoint attributed *none* of HPS's services to Minnesota based on its conclusion that these services were received *entirely* by HIC in Wisconsin. In other words, MarketPoint claimed that *none* of HPS's services were received in Minnesota in 2016 and that it was entitled to a full refund for the multistate business income tax it paid in the state for that tax year. Accordingly, to be entitled to the refund it claimed, MarketPoint needed

28

to show that none of HPS's pharmacy benefit management services were received in Minnesota in 2016.

MarketPoint could not meet its burden of showing that none of HPS's services were received in Minnesota in 2016, because the Services Sourcing Statute and the parties' stipulations at summary judgment foreclose that conclusion. As discussed above, "received" means "to come into possession of or get from some outside source." *See* Minn. Stat. § 290.191, subd. 5(j). In the context of the Services Sourcing Statute, this definition encompasses receipt of services by a customer's customer. Applying this definition to the circumstances here shows that HPS's services were received both by HIC in Wisconsin and by HIC plan members in Minnesota. Absent the parties' stipulations, summary judgment may not have been appropriate, as there likely would have been a genuine issue of material fact as to apportionment between states where HPS's individual services were received.

But this case is unique because the parties stipulated that all of the $279,726,839 in receipts at issue from HPS's services should be "sourced together." In other words, the parties stipulated that HPS's services tied to those receipts must be attributed either solely to Wisconsin or solely to Minnesota. And, absent evidence that the parties have abandoned it, a stipulation of fact is binding. *KCP Hastings, LLC v. County of Dakota*, 931 N.W.2d 773, 784 (Minn. 2019). There is no such evidence here. To the contrary, both parties reaffirmed their all-or-nothing stipulation during oral argument. Because MarketPoint had the burden of showing that none of the services at issue were received in Minnesota, and because MarketPoint could not meet that burden under the correct interpretation of the

29

Services Sourcing Statute, we conclude that the tax court did not err by granting the Commissioner's motion for summary judgment.[17]

## CONCLUSION

For the foregoing reasons, we affirm the decision of the tax court.

Affirmed.

---

[17] We note that the tax court granted the Commissioner's motion for summary judgment based on its determination that MarketPoint failed to prove an essential element of its claim. *Humana*, 2024 WL 4997432, at *20. Because we conclude that summary judgment was appropriate here, regardless of the tax court's reasoning, we decline to consider whether MarketPoint failed to prove an essential element of its claim. *See Doe v. Archdiocese of St. Paul*, 817 N.W.2d 150, 163 (Minn. 2012) ("[W]e may affirm a grant of summary judgment if it can be sustained on any grounds.").